# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Ann C. Williams | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 96 C 5013 | **DATE** | 3/30/2000 |
| **CASE TITLE** | USA ex rel. JOHN WHITEHEAD vs. THOMAS PAGE | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due _____. Reply to answer brief due _____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Pursuant to memorandum opinion and order, the court denies Whitehead's petition for a writ of habeas corpus under 28 U.S.C. section 2254.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | | number of notices |
| | No notices required. | | MAR 3 1 2000 |
| | Notices mailed by judge's staff. | | date docketed |
| | Notified counsel by telephone. | | S.B. |
| ✓ | Docketing to mail notices. | | docketing deputy initials |
| ✓ | Mail AO 450 form. | | |
| | Copy to judge/magistrate judge. | | date mailed notice |
| DL | courtroom deputy's initials | Date/time received in central Clerk's Office | mailing deputy initials |

Document Number

39

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

UNITED STATES OF AMERICA   )
ex rel. JOHN WHITEHEAD,   )
   )
       Petitioner,   )
   )
     v.   )   96 C 5013
   )
THOMAS PAGE,   )
   )
       Respondent.   )

**DOCKETED**

MAR 3 1 2000

## MEMORANDUM OPINION AND ORDER

John Whitehead ("Whitehead") was convicted by a jury of murder and aggravated kidnaping and sentenced to death by the trial judge. After the Illinois Supreme Court affirmed his conviction and sentence on direct appeal, People v. Whitehead, 508 N.E.2d 687 (Ill. 1987), Whitehead filed several petitions for post-conviction relief in Illinois state court. The trial court denied those petitions and the Illinois Supreme Court affirmed. See People v. Whitehead, 662 N.E.2d 1304 (Ill. 1996). Whitehead then filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254 alleging eleven constitutional errors during his state court trial and appeal. For the following reasons, the court denies the petition.

39

## Background

Because the Illinois Supreme Court's two published opinions thoroughly describe the events of this case, the background facts and procedural history will not be recounted in great detail. Rather, the court will discuss the facts necessary to understand and analyze Whitehead's constitutional arguments with a presumption of correctness for the facts as found by the Illinois Supreme Court. See 28 U.S.C. § 2254(e)(1).

On August 9, 1982, the parents of five-year-old Vickie Wrobel ("Vickie") discovered that Vickie was missing. While searching for Vickie, Vickie's mother asked the Wrobel's tenant and next-door neighbor, Esther Harmon ("Harmon"), whether she had seen Vickie. Harmon lived with her daughter LeAllen Starbuck, and LeAllen's husband William Starbuck in a home that the Wrobels owned adjacent to a tavern that the Wrobels owned and operated. Whitehead also lived in this house. In response to Mrs. Wrobel's questions, Harmon discovered that both Whitehead and her car, which Harmon sometimes allowed Whitehead to use with her permission, were missing. Local police agencies were notified that

Whitehead was suspected of stealing Harmon's car and that he might have taken Vickie.

Sometime after midnight the following morning, Whitehead telephoned the Wrobels' tavern and spoke with LeAllen Starbuck. He told LeAllen that he was calling from Samuel and Jeanine Starbuck's home in another town. Jeanine Starbuck is Whitehead's sister and is married to William Starbuck's brother. LeAllen told Whitehead to stay at his sister's home, and she then told police where Whitehead was located. Local police arrived at Jeanine and Samuel Starbuck's residence and saw Esther Harmon's automobile parked in front of the residence. From outside the car, officers observed clothing on the front seat that matched the description of clothing worn by Vickie when she disappeared the previous evening. Samuel Starbuck let the police officers into his living room, where Whitehead was seated. Whitehead admitted to being in possession of Harmon's car, and he was arrested for auto theft.

Two Joliet police department detectives questioned Whitehead from about 4:00 a.m. until 6:30 a.m. that day. He was generally responsive, but when questioned concerning the whereabouts or condition of Vickie

Wrobel, Whitehead made no statements other than "I can't" or "I can't tell you." The interrogation ended when Whitehead indicated a desire to consult with an attorney.

At approximately 7:30 a.m. on August 10, 1982, railroad workers discovered a naked body, later identified as the body of Vickie Wrobel, floating in the Mazon River. An autopsy revealed that Vickie had been sexually molested and had been killed by strangulation and drowning. Physical evidence recovered alongside the river included articles of Vickie's clothing and a shirt later identified as the shirt worn by Whitehead on the evening of August 9. In the shirt pocket police found a lottery ticket with writing that a handwriting analyst identified as Whitehead's.

Other physical evidence implicating Whitehead was found in Harmon's automobile. There police found some of Vickie's clothing on the front seat. Also found was a plastic drinking cup similar to that given Vickie by the Wrobels' bartender shortly before the girl disappeared. The armrest and passenger door panel were stained with a fluid that was determined to have a chemical composition consistent with the

nonalcoholic "cocktail" served to Vickie Wrobel in the plastic cup. The floormats in Harmon's car were damp, and vegetation like that growing along the Mazon River was also found on the floor area in front of the driver's seat. Other evidence produced at trial placed the defendant in the general vicinity where Vickie Wrobel was playing immediately prior to her apparent kidnaping.

While in the custody of the Joliet police department on August 10 and 11, Whitehead made eight statements in which he admitted kidnaping, sexually assaulting, and killing Vickie. His description of how he sexually abused the victim was consistent with the autopsy report, and his claim of having forced Vickie Wrobel to drink beer was also substantiated by the post-mortem examination. Over defense objections, Whitehead's confessions were admitted during his trial.

After listening to all of the evidence, the jury returned a verdict of guilty and convicted Whitehead of both murder and aggravated kidnaping. Whitehead then waived his right to have the jury determine his sentence and evidence of aggravation and mitigation was presented to the trial judge. The court then sentenced Whitehead to death. Whitehead's state

direct appeal, state post-conviction appeal, and appeals to the United States Supreme Court were all unsuccessful. Whitehead therefore filed this petition for federal habeas corpus relief under 28 U.S.C. § 2254.

## Analysis

Because Whitehead filed his petition for a writ of habeas corpus after April 24, 1996, the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), apply to his case. See Lindh v. Murphy, 521 U.S. 320, 336 (1997); Schaff v. Snyder, 190 F.3d 513, 521 (7th Cir. 1999). Under the AEDPA, "habeas relief shall not be granted unless the state court decision was 'contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States,' or 'was based on an unreasonable determination of the facts in light of the evidence presented to the State court proceeding.'" Schaff, 190 F.3d at 521 (quoting 28 U.S.C. § 2254(d)(1), (2)).

In <u>Schaff</u>, 190 F.3d at 522, the Seventh Circuit explained the narrow scope afforded federal review of state court decisions in habeas petitions by stating:

> To secure a writ under [the AEDPA], a petitioner first must show "that the Supreme Court has 'clearly established' the propositions essential to [his] position." <u>Mueller v. Sullivan</u>, 141 F.3d 1232, 1234 (7th Cir. 1998). "Only 'clearly established' rules could be applied on collateral attack; and a rule was not 'clearly established' unless it was 'compelled by existing precedent.'" <u>Hogan v. Hanks</u>, 97 F.3d 189, 192 (7th Cir. 1996) (quoting <u>Saffle v. Parks</u>, 494 U.S. 484, 488 (1990). . . [Lower courts] may no longer rely upon our own precedent or that of other circuit courts of appeals to grant a writ. <u>See Yancey</u>, 113 F.3d at 106. A petitioner must have a Supreme Court case to support his claim, and that Supreme Court decision must have clearly established the relevant principle as of the time of his direct appeal. <u>See id.</u> at 106-07.

> The petitioner next must show that the state court's decision was either "contrary to" clearly established Supreme Court case law or, alternatively, was an "unreasonable application" of Supreme Court case law. <u>See Bocian v. Godinez</u>, 101 F.3d 465, 471 (7th Cir. 1996) (citing <u>Lindh v. Murphy</u>, 96 F.3d 856, 869-70 (7th Cir. 1996) (en banc), <u>reversed on other grounds</u>, 521 U.S. 320 (1997)). Whether the state ruling was "contrary to" Supreme Court case law is a legal determination that [federal courts] review <u>de novo</u>. In <u>Lindh</u>, we explained that section 2254(d) requires us to give state courts' opinions a respectful reading, and to listen carefully to their conclusions, but when the state court addresses a legal question, it is the law "as determined by the Supreme Court of the United States" that prevails. <u>Id.</u> at 869.

Whether the state court's holding involved an "unreasonable application" of clearly established federal law, as determined by the Supreme Court, is a mixed question of law and fact that we traditionally also review <u>de novo</u> but with a grant of deference to any reasonable state court decision. <u>See</u> <u>Hall v. Washington</u>, 106 F.3d 742, 748 (7th Cir. 1997). When determining whether the state court unreasonably applied clearly established Supreme Court precedent, we recognize that "the statute commands deference to the state court's judgment by using the word 'unreasonable,' which is stronger than 'erroneous' and maybe stronger than 'clearly erroneous.'" <u>Hennon v. Cooper</u>, 109 F.3d 330, 334 (7th Cir. 1997). If the determination was reasonable, that is, "at least minimally consistent with the facts and circumstances of the case," we shall uphold the state court ruling, even if it is not well reasoned or fully reasoned, <u>id.</u> at 335, or even "if it is one of several equally plausible outcomes." <u>Hall</u>, 106 F.3d at 748. On the other hand, if the determination is "at such tension with governing U.S. Supreme Court precedents, or so inadequately supported by the record, or so arbitrary," then the writ must issue. <u>Hall</u>, 106 F.3d at 749.

<u>Schaff v. Snyder</u>, 190 F.3d 513, 522 (7th Cir. 1999). With these strict standards in mind, the court turns to Whitehead's arguments.

## I.

After taking Whitehead into police custody, the Joliet police began interrogating him about the disappearance of Vickie Wrobel. Whenever the police asked Whitehead about Vickie, he simply responded, "I can't"

or "I can't tell you." Eventually, Whitehead told the police that he wanted an attorney and the interrogation ended.

Prior to Whitehead's interrogation, both LeAllen Starbuck and Jeanine Starbuck indicated to police that if Whitehead knew anything about Vickie's disappearance, they were the only two people in whom he would confide that information. Nevertheless, police refused to let either LeAllen Starbuck or Jeanine Starbuck speak to Whitehead and unsuccessfully tried to get Whitehead to confess that he knew something about Vickie's whereabouts. After two and half hours of trying, and after Whitehead had invoked his right to have an attorney with him during any further questioning, the police ended their interrogation.

Before and after the interrogation LeAllen Starbuck requested to speak with Whitehead, but the police initially refused to let her see him. Eventually, the police allowed LeAllen to meet with Whitehead and during their meeting, LeAllen persuaded Whitehead to tell her everything he knew about Vickie's disappearance. Whitehead then admitted to LeAllen that he had killed Vickie. LeAllen convinced Whitehead that he should confess to the police because he was mentally ill, needed treatment, and that the

only way he could get help was to confess his crime to the police. Whitehead agreed to confess and sent LeAllen out of the room to notify the police that he would talk to them. When police returned to the room, Whitehead made eight statements in which he admitted to killing and raping Vickie.[1] These inculpatory statements were admitted into evidence at his trial and the Illinois Supreme Court found no constitutional violation in their admission.

Whitehead contends that the state courts violated his rights under the Fifth and Fourteenth Amendments of the Federal Constitution when they allowed his confessions into evidence at his trial in violation of Miranda v. Arizona, 384 U.S. 436 (1966) and Edwards v. Arizona, 451 U.S. 477 (1981). According to Whitehead, the state courts should have suppressed his confessions because they were the product of his conversation with LeAllen Starbuck which, Whitehead argues, constituted an "interrogation" that was initiated by the police. Because he had invoked his Miranda right to have an attorney with him during police

---

[1] Although neither party mentions it, the court presumes that Whitehead made a voluntary, knowing, and intelligent waiver of his previously asserted Miranda rights after his conversation with LeAllen Starbuck and before his confessions to the police. See, e.g., Edwards v. Arizona, 451 U.S. 477, 482-83 (1981) (emphasizing that a waiver of Miranda rights must be both (1) voluntary and (2) knowing and intelligent).

questioning, Whitehead contends that the police were prohibited from reinitiating any interrogation either directly or through LeAllen Starbuck.

Since Whitehead had asserted his right to have an attorney present with him during any further police questioning, Miranda required the police to stop interrogating him. See Edwards, 451 U.S. at 484-85. However, Edwards expressly recognized that a suspect could reopen the door to interrogation if "the accused himself initiates further communication, exchanges, or conversations with the police." Id. at 485. In this case, because Whitehead's confessions were the product of his conversation with LeAllen Starbuck, the dispositive issue is whether LeAllen Starbuck's conversation with Whitehead constituted "interrogation" as that term was contemplated in Miranda.

The Supreme Court clarified the scope of a Miranda "interrogation" in Rhode Island v. Innis, 446 U.S. 291 (1980), when it held that the goals of Miranda could only "be effectuated if those safeguards extended not only to express questioning, but also to it's functional equivalent." Id. at 301. The Court defined the "functional equivalent" of questioning as "any words or actions on the part of the police (other than those normally

attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." Id. When making this determination, the focus is "primarily upon the perceptions of the suspect, rather than the intent of the police." Id.

Whitehead contends that the police used LeAllen Starbuck to sidestep Miranda and Edwards because they knew that Whitehead would disclose any information he had about Vickie to LeAllen. Because the police reasonably should have known that LeAllen Starbuck could persuade him to confess, Whitehead insists that his conversation with LeAllen was a police-initiated "interrogation" and his subsequent confessions were therefore inadmissible.

Several courts, including the United States Supreme Court, have rejected very similar arguments. In Arizona v. Mauro, 481 U.S. 520 (1987), a murder suspect was in custody and had invoked his Miranda rights to have an attorney with him during police questioning. When his wife asked police if she could speak to the suspect, police initially refused, but later allowed the two to meet with a police officer in the

room recording the conversation. Both the suspect and his wife agreed to these conditions.

During their meeting, the suspect and his wife made several statements that both incriminated the suspect and seriously undermined the insanity defense he asserted at trial. The suspect later sought to suppress the statements on the ground that the conversation amounted to a police-initiated "interrogation" because the police should have known that he would incriminate himself during a conversation with his wife.

The Supreme Court rejected the argument and found that the police's decision to allow the conversation did not constitute an "interrogation." The Court highlighted that there was no evidence that the police had "sent [the suspect's wife] in to see her husband for the purpose of eliciting incriminating statements." Mauro, 481 U.S. at 528. The Court also focused on the unlikelihood that "a suspect, told by officers that his wife will be allowed to speak to him, would feel that he was being coerced to incriminate himself in any way." Id. Finally, the Court acknowledged that the officers were aware of the "possibility" that the suspect would incriminate himself while talking to his wife, but

dismissed this concern by stating that "officers do not interrogate a suspect simply by hoping that he will incriminate himself." Id.

Several other courts have also concluded that police do not violate the Fifth Amendment's protections by allowing a close relative or friend to talk to a suspect in custody when that discussion results in a confession. For example, in United States v. Gaddy, 894 F.2d 1307, 1311 (11th Cir. 1990), the court held that a suspect was not "interrogated" when his aunt, a police department employee, urged him without prompting from the police to tell authorities what he knew about a crime for which he was in custody and being questioned. Similarly, in Snethen v. Nix, 885 F.2d 456, 457 (8th Cir. 1989), the court held that a suspect was not "interrogated" when he confessed after a conversation with his mother which his mother arranged by telling police "if [my son] did this, he will tell me." Id. Additionally, several state courts have reached the same conclusions on similar facts. See, e.g., Gilchrist v. State, 585 So.2d 165, 176-77 (Ala. Ct. Crim. App. 1991); People v. Lucas, 548 N.E.2d 1003, 1010 (Ill. App. Ct. 1989); State v. Romero, 552 So.2d 45, 50-52 (La. App. Ct. 1989).

In this case, there is no evidence that the police sent LeAllen Starbuck to meet with Whitehead for the purpose of obtaining a confession. As in <u>Mauro</u>, the police certainly must have known that it was a possibility, but simply hoping that a meeting with a relative or loved one will produce a confession does not offend the Fifth Amendment. See <u>Mauro</u>, 481 U.S. at 529. Additionally, there is no evidence that LeAllen agreed to act as a police agent to induce Whitehead's confessions. And there is no suggestion that LeAllen's presence caused Whitehead to feel coerced or threatened to incriminate himself. Based on these facts, and the law as determined by the United States Supreme Court in <u>Edwards</u>, <u>Innis</u>, and <u>Mauro</u>, the court finds that the Illinois Supreme Court's decision on this issue was not "contrary to, or . . . an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

## II.

Whitehead next raises three arguments related to the jury that found him guilty. Whitehead first contends that excessive pretrial publicity

deprived him of his Sixth and Fourteenth Amendment rights to a fair and impartial jury. According to Whitehead, the state trial judge should have transferred the case to a neighboring county where the prospective jurors would not have been tainted by the pretrial publicity.

In support of this claim, Whitehead points to several articles published in the Morris Daily Herald about the investigation of Vickie Wrobel's death, the events leading to Whitehead being charged in the case, and pretrial motions. Whitehead also emphasizes that of those individuals in the venire who actually sat on the jury, five indicated that they had heard of the case by reading the newspaper. Upon questioning by the state trial court, one juror stated that she had read articles about the case that "had something to do with how many jurors they were going to choose" and that described "going through a lot of motions in court about it, some different legalities; I don't even remember what they were."

Another juror commented that he had read six articles about the case regarding "normal appeals and motions" and "that the man had been charged and that there had been a motion for moving the trial and other

-16-

things that was [sic] in there."  Yet another juror said that he recalled reading that "one police officer erased a tape.  I do remember that.  What the tape was, I couldn't tell you.  I don't recall what the tape was except through some error, he erased the tape.  That's all I remember about it at this time, yes."

One other juror said that he had not read a "great deal about the case and did not recall reading any statements by [Whitehead] or police officers."  The same juror, however, did confess that "all I know is what I have read in the paper, which I assume they know what they are talking about more or less, and that's all, what's been said in the paper."  Nevertheless, upon further questioning by the trial judge, each of these five jurors testified that they could approach the case with an open mind, despite what they had read.

"The constitutional standard of fairness requires that a defendant have a panel of impartial, 'indifferent jurors.'"  Murphy v. Florida, 421 U.S. 794, 799 (1975) (quoting Irvin v. Dowd, 366 U.S. 717, 722 (1961)).  Qualified jurors need not, however, be totally ignorant of the facts and issues involved.  "To hold that the mere existence of any

preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." Irvin, 366 U.S. at 723. At the same time, a juror's assurances that he will remain impartial is not dispositive of the issue and it remains for the defendant to demonstrate "the actual existence of such an opinion in the mind of the juror as will raise the presumption of partiality." Id. In sum, "the relevant question is not whether the community remembered the case, but whether the jurors at the trial had such fixed opinions that they could not judge impartially the guilt of the defendant." Patton v. Yount, 467 U.S. 1025, 1035 (1984).

Given the statements made by these five jurors, the court cannot say that they had fixed opinions about Whitehead's guilt or innocence that deprived him of his constitutional right to an impartial jury. Although these jurors admitted having read about the case, none of them made any statements that suggested that the newspaper articles caused them to

develop a fixed opinion as to Whitehead's guilt or innocence. Additionally, the jurors' innocuous comments about the articles they had read indicated only a general awareness of the case and did not relate to any specific or prejudicial facts that would lead them to form fixed opinions about the case before hearing the evidence. Finally, each of these five jurors did testify during *voir dire* that they could approach the case with an open mind and make their decision based on the evidence.

The court finds these facts very similar to those present in <u>Patton v. Yount</u>, 467 U.S. 1025 (1984) and <u>Murphy v. Florida</u>. 421 U.S. 794 (1975). In both <u>Patton</u> and <u>Yount</u>, the defendants showed that some of the jurors had a general or "vague awareness" of the facts of the case, but failed to show evidence that the jurors had a "partiality that could not be laid aside." <u>Murphy</u>, 421 U.S. at 800. In both <u>Patton</u> and <u>Murphy</u>, the Supreme Court held that mere knowledge of a case before sitting as a juror does not violate the defendant's right to an impartial jury. Based on the constitutional standards as adjudicated by the Supreme Court in <u>Patton</u> and <u>Murphy</u>, the court finds that the Illinois Supreme Court's ruling

on this issue was not contrary to or an unreasonable application of federal law.

Whitehead's remaining two arguments relating to the jury can be dealt with much more quickly. First Whitehead contends that his right to an impartial jury was destroyed when the local newspaper published the names and addresses of all 12 jurors and 2 alternate jurors. The court agrees with the Illinois Supreme Court that this argument fails because Whitehead does not show that the publication caused any adverse consequences to the jurors and mere speculation about prejudice is not sufficient to establish a constitutional violation. See People v. Whitehead, 662 N.E.2d 1304, 1326 (Ill. 1996).

Moreover, the facts in this case are drastically different from the one case in which the United States Supreme Court found that publication of the jurors' names contributed to the deprivation of a fair trial. In Sheppard v. Maxwell, 384 U.S. 333 (1966), the court presumed prejudice from pretrial publicity that the defendant refused to take a lie detector test; that he was uncooperative with police; that his family had set up a "protective ring" around him; that there had not yet been an inquest; that

the investigation had been inept because of "friendships, relationships, [and] hired lawyers"; and "a front-page charge that somebody is 'getting away with murder.'" The defendant in that case was also subjected to a televised public inquest at which his counsel was forcibly ejected from the room by the Coroner conducting the inquest, causing cheers from the audience. Finally, the press published the names and addresses of the potential jurors, which subjected them to many letters and phone calls regarding the trial. Based on the combination of extensive pretrial publicity and publication of the jury's names, the Court concluded that the defendant could not have received a fair trial.

Unlike Sheppard, the pretrial publicity in this case was far less extensive, pervasive, and prejudicial. The newspaper reports in this case were far more factual than the sensationalized articles in Sheppard. And, most importantly, unlike Sheppard, the jurors in this case whose names had been published did not receive any letters or phone calls about the case. Since there is no evidence that the publication of the jurors' names and addresses resulted in any external parties attempting to influence the

jury's decision, the court cannot find that the publication biased the jurors' opinions.

Whitehead's final jury argument asserts that he did not receive a fair trial by an impartial jury because Vickie Wrobel's mother made an emotional outburst directed towards him in the jury's presence. Whitehead complains that this outburst prejudiced and inflamed the jury to convict him. The court rejects this contention because existing federal precedents defeat his claim. In <u>Kinnamon v. Scott</u>, 40 F.3d 731 (5th Cir. 1994), the court found no "prejudicial error of constitutional magnitude" when the teenage daughter of a deceased victim entered the courtroom in the presence of the jury and began screaming that the defendant had killed her father. <u>See id.</u> at 734. The court reasoned that the incident was brief and communicated nothing new to the jury because the jury must have known that the victim's daughter would be angry at the person the state had accused of murdering her father. <u>See id.</u>

Similarly, in <u>Messer v. Kemp</u>, 760 F.2d 1080 (11th Cir. 1985), the court rejected defendant's argument that he was entitled to a new trial because the murder victim's father "lunged toward the defendant

screaming and shouting" in the presence of the jury. See id. at 1086-88. In that case, the court found no prejudice because the trial court instructed the jury to disregard the outburst. See id. at 1087. The court also determined that the defendant did not suffer prejudice because the outburst was not "calculated to influence the jury in their deliberations." Id. at 1088.

Based on existing federal law, the Illinois Supreme Court correctly found that Mrs. Wrobel's outburst did not improperly inflame the jury or unfairly prejudice Whitehead's trial. Like Kinnamon, the incident at Whitehead's trial was brief and the jurors must have known that the victim's family harbored anger toward the man accused of murdering Vickie Wrobel. Additionally, like Messer, the judge at Whitehead's trial admonished the jury not to consider the outburst and the remark was directed at Whitehead rather than calculated to influence the jury's deliberations. Therefore, the Illinois Supreme Court's ruling on this issue was not contrary to, or an unreasonable application of, clearly established federal law.

## III.

Whitehead's next argument deconstructs the thought patterns of a juror and attempts to establish that this juror's way of thinking deprived him of a fair and impartial jury. In particular, Whitehead presents the affidavit of juror Glenn Friant ("Friant") in which Friant describes the mental process he used to assess evidence and ultimately determine whether he believed Whitehead was guilty as charged. In that affidavit, Friant stated:

> At the commencement of the trial . . . I was resolved to weigh the evidence either for or against Mr. Whitehead fairly. In evaluating his guilt or innocence, I used what is best described as a mental line scale ranging from zero to ten, with ten representing unequivocal guilt and zero representing unequivocal innocence. Before any one piece of evidence was presented I considered Mr. Whitehead's position on this scale to be at five. I then altered his position on the scale as I saw fit upon the introduction of each piece of evidence. At the end of the trial Mr. Whitehead was positioned at point ten on this scale.

(Friant Aff. at ¶ 3.) Based on this affidavit, Whitehead contends that he was deprived of a fair and impartial jury because Friant did not afford him the appropriate presumption of innocence. Rather, Whitehead argues that

Friant started out the trial with a presumption of guilt (five on the sliding scale rather than zero which represented unequivocal innocence).

The fundamental problem with this argument is that it ignores the fact that the government met its burden of proof at trial. In <u>Taylor v. Kentucky</u>, 436 U.S. 478, 483-84 & n.12 (1977), the Court noted the "error of [the] view" that "the presumption of innocence and the equally fundamental principle that the prosecution bears the burden of proof beyond a reasonable doubt were logically separate and distinct." <u>Id.</u> at 483. In a lengthy footnote, the Court explained that a defendant's "presumption of innocence" is just another way of describing the constitutional mandate that the state prove every element of a criminal offense beyond a reasonable doubt. In reaching this conclusion, the Court reasoned:

> The Court [previously] viewed the presumption of innocence as "an instrument of proof created by the law in favor of one accused, whereby his innocence is established until sufficient evidence is introduced to overcome the proof which the law has created." As actual "evidence in favor of the accused," it was distinguished from the reasonable-doubt standard, which merely described "the condition of mind produced by the proof resulting from the evidence in the cause." Professor Thayer ably demonstrated the error of this distinction, pointing out that the so-called "presumption" is not

evidence – not even an inference drawn from a fact in evidence -- but instead is a way of describing the prosecution's duty both to produce evidence of guilt and to convince the jury beyond a reasonable doubt. Shortly after the appearance of Thayer's criticism, the Court, in a case in which the presumption-of-innocence instruction was given, retreated from its conclusion that the presumption of innocence is evidence to be weighed by the jury.

It is now generally recognized that the "presumption of innocence" is an inaccurate, shorthand description of the right of the accused to "remain inactive and secure, until the prosecution has taken up its burden and produced evidence and effected persuasion; i.e., to say in this case, as in any other, that the opponent of a claim or charge is presumed not to be guilty is to say in another form that the proponent of the claim or charge must evidence it." The principal inaccuracy is the fact that it is not technically a "presumption" -- a mandatory inference drawn from a fact in evidence. Instead, it is better characterized as an "assumption" that is indulged in the absence of contrary evidence.

Id. at 483 n.12 (internal citations omitted).

Whitehead's argument fails under the Supreme Court's reasoning in Taylor that the "presumption of innocence" is simply a synonym for the state's burden to prove every element of the crime beyond a reasonable doubt. Even assuming arguendo that Friant did not afford Whitehead the appropriate "presumption of innocence" when he started out his consideration of Whitehead's guilt or innocence, this could not have

caused an error of constitutional magnitude so long as the state proved its case beyond a reasonable doubt. Based on the facts presented at trial and reviewed in the Illinois Supreme Court's opinions, this court has little trouble concluding that the government met its burden of proof. Additionally, Friant himself stated in his affidavit that "I believe that the evidence presented to the jury in this case warranted the verdicts reached by the jury." (Friant Aff. at ¶ 7.) Because the state proved its case beyond a reasonable doubt, the Illinois Supreme Court's decision on this issue was not contrary to, or an unreasonable application of, federal law.[2]

## IV.

Whitehead next argues that prosecution made remarks during closing argument that deprived him of a fair trial because the prosecutor referred to the fact that Whitehead did not testify in his own defense. In support of this argument, Whitehead points to the prosecutor's comments that Whitehead's confessions were "undenied," "unrebutted," and

---

[2] The court also agrees with the Illinois Supreme Court's reason for rejecting this argument. The Illinois court found no error because Whitehead failed to show any proof that juror Friant disregarded the trial court's instructions concerning the presumption of innocence and the State's burden of proving its case beyond a reasonable doubt.

"uncontradicted."    Specifically, the prosecutor made the following

remarks:

> Unless that witness (referring to Whitehead) has been sworn
> up there on the witness stand you will not have had the
> opportunity to observe the demeanor of the witness.
>
> What do you have before you?   Unrebutted, undenied,
> uncontradicted that the defendant both in a tape recorded
> statement and a written statement admitted [drowning] Vickie
> Wrobel . . . Not one piece of evidence put on by either party
> contradicts that.

According to Whitehead, these remarks violated the Fifth Amendment

because they were improper comments about Whitehead's failure to

testify at trial.[3]   Because he is the only person who could rebut his

confessions, Whitehead maintains that any reference to the fact that the

confessions were uncontradicted violated the Fifth Amendment.

The government responds to this argument by arguing that

Whitehead is procedurally barred from raising this claim in his federal

habeas petition.   The government correctly points out that when

Whitehead raised these arguments in his direct appeal, the Illinois

---

[3] Whitehead also highlights the prosecution's attack on the believability of his defenses of intoxication and lack of intent.  The court finds nothing improper about these remarks by the prosecutor.

Supreme Court refused to reach the merits because Whitehead did not object to the remarks during the trial or in his post-trial brief. See People v. Whitehead, 508 N.E.2d 687, 694-95 (Ill. 1987). Since the Illinois Supreme Court declined to address these arguments on direct appeal, this constitutes an adequate and independent state ground for a decision and forecloses federal review of the issue. See Franklin v. Gilmore, 188 F.3d 877, 886 (7th Cir. 1999); accord Flamer v. State of Delaware, 68 F.3d 736, 755-56 (3d Cir. 1995).

Whitehead argues that this procedural bar does not completely foreclose federal review. According to Whitehead, since he raised the issue with the Illinois Supreme Court during his state post-conviction proceedings, the federal courts can consider the issue on habeas review. While Whitehead concedes that he did not raise this specific Fifth Amendment argument in his post-conviction petition, he contends that he adequately preserved the Fifth Amendment issue by raising it in the context of a Sixth Amendment ineffective assistance of counsel claim. In other words, Whitehead contends that since the prosecutor's remarks formed the factual basis for ineffective assistance of counsel claim raised

in post-conviction proceedings, and the Illinois Supreme Court considered those facts, he is not barred from raising the issue.

Whitehead's argument raises an issue of "fair presentment." Under this doctrine, "exhaustion of state remedies requires that petitioners 'fairly present' federal claims to the state courts in order to give the State the 'opportunity to pass upon and correct alleged violations of its prisoners federal rights.'" <u>Duncan v. Henry</u>, 513 U.S. 364, 365 (1995) (quoting <u>Picard v. Connor</u>, 404 U.S. 270, 275 (1971)). For a constitutional claim to be "fairly presented" to a state court, "both the operative facts and the 'controlling legal principles' must be submitted to the court." <u>Momient-El v. DeTella</u>, 118 F.3d 535, 539 (7th Cir. 1997) (quoting <u>Verdin v. O'Leary</u>, 972 F.2d 1467, 1474 (7th Cir. 1992)). "It is not enough that all the facts necessary to support the federal claim were before the state courts, or that a somewhat similar state-law claim was made." <u>Picard</u>, 404 U.S. at 277.

In this case, Whitehead's failure to raise the specific Fifth Amendment argument he now asserts does not bar federal review of the claim. Whitehead's Sixth Amendment claim in his state post-conviction

proceeding explicitly cited the facts that form the basis for his current Fifth Amendment claim. Similarly, the sole legal predicate for the Sixth Amendment ineffective assistance of counsel claim was that it caused a Fifth Amendment violation. Therefore, the Illinois courts were required to consider the alleged Fifth Amendment violation in order to resolve the claimed Sixth Amendment issue. Because the Illinois courts were required to resolve both issues, the court finds that Whitehead fairly presented his Fifth Amendment claim during his state post-conviction proceedings and that he properly exhausted his state court remedies on this claim.

The court notes that at least two federal appellate courts have reached the same conclusion on very similar facts. In <u>Odem v. Hopkins</u>, 192 F.3d 772, 775-76 (8th Cir. 1999), the court held that a habeas petitioner fairly presented a claimed <u>Brady</u> violation "even though the issue of the State's turning over of exculpatory evidence [was] contained solely within an argument pertaining to ineffective assistance of counsel." <u>Id.</u> at 775. Similarly, in <u>Ramdass v. Angelone</u>, 187 F.3d 396, 409 (4th Cir. 1999), <u>cert. granted</u>, 120 S. Ct. 784 (2000), the court found that a habeas petitioner preserved an issue for federal review "even though the

claim appeared under the heading of ineffective assistance of counsel" because the petitioner's argument was based on the appropriate Supreme Court case and alleged facts that supported the argument. See id.

Because Whitehead exhausted his state court remedies on this claim, the court turns to the merits. To show that a prosecutor's closing remarks violated a defendant's right to a fair trial, courts consider whether: (1) the prosecutor manipulated or misstated the evidence, (2) the comments implicated other specific rights of the accused (such as the right to remain silent), (3) the comments were invited by or responsive to defense counsel's summation, (4) the trial court's instructions ameliorated the harm, (5) the evidence weighed heavily against the defendant, and (6) the defendant had an opportunity to rebut the prosecutor's comments. See Swofford v. Dobucki, 137 F.3d 442, 444-45 (7th Cir. 1996), cert. denied, 119 S. Ct. 104 (1998) (citing Darden v. Wainwright, 477 U.S. 168, 181-82 (1986)). While the court must consider each of these factors, "the relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" Darden, 477 U.S. at 181 (quoting Donnelly v.

DeChristoforo, 416 U.S. 637, 641 (1974)); see also Stewart v. United States, 366 U.S. 1, 7-10 (1961) (analyzing whether prosecutor's improper comment about defendant's failure to testify constituted harmless error).

In this case, although the prosecutor's comments were, without a doubt, clearly inappropriate under the Fifth and Fourteenth Amendments, the court cannot say that they so corrupted the integrity of the trial as to deprive Whitehead of due process and a fair trial. In short, the powerful and completely overwhelming evidence presented against Whitehead would have secured Whitehead's conviction even if the prosecutors had not made the improper remarks. The prosecution introduced several pieces of physical evidence which linked Whitehead to the crime as well as his several confessions that he killed Vickie. The evidence was too strong to have been unfairly tainted by the prosecutor's remarks. Because the remarks could not have altered the outcome of the trial, there was no constitutional error. See United States v. Robinson, 485 U.S. 25, 32-34 (1988); Lockett v. Ohio, 438 U.S. 586, 594-95 (1978). In sum, the court cannot say that the Illinois Supreme Court's ruling on this issue

was unreasonable or contrary to clearly established federal law as required by 28 U.S.C. § 2254(d)(1).

## V.

Whitehead next raises a host of different arguments contending that he received ineffective assistance of counsel during his trial and direct appeal in violation of his Sixth Amendment rights. As for Whitehead's arguments concerning ineffective assistance of trial counsel, the court can dispose of those issues quickly. In short, assuming *arguendo* that the alleged errors fell below the standard of professional competence, no alternative strategy that Whitehead's trial counsel could have employed would have changed the probable outcome of his trial. See Strickland v. Washington, 466 U.S. 668, 694 (1984) ("The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of a proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.") Rather, as the court has observed, the physical evidence against Whitehead was incriminating far beyond a reasonable doubt.

Additionally, Whitehead confessed eight times to killing Vickie Wrobel. In light of the devastating evidence of his guilt, no strategy that his trial counsel could have changed would have affected the probable outcome of Whitehead's trial.

Whitehead's claim of ineffective appellate counsel meets the same fate. Whitehead contends that his appellate counsel was ineffective by failing to highlight trial counsel's errors as ineffective assistance of trial counsel. This argument fails because even if Whitehead's appellate counsel would have raised these arguments on direct appeal, they would have failed. The weight of the evidence against Whitehead at trial was so extraordinary that any of the steps or investigations that Whitehead says his trial counsel could or should have taken would not have changed the outcome of his trial. Thus, even if his appellate attorney would have argued ineffective assistance of trial counsel, this argument would not have won a reversal or new trial. Accordingly, the Illinois Supreme Court's decision on this issue was not unreasonable or contrary to firmly established federal law.

## VI.

Whitehead's next claim centers around the state trial court's refusal "to appoint or allow funds for mitigation assistance, in the form of a specifically trained investigator or social worker." Whitehead first asserts that the trial court's failure to appoint a mitigation expert to assist with the sentencing phase of his capital trial violated his due process rights.[4] Whitehead premises this claim on the Supreme Court's decision in <u>Ake v. Oklahoma</u>, 470 U.S. 68 (1985).

In <u>Ake</u>, the Court held that the state must provide a psychiatric expert "in the context of a capital sentencing proceeding, when the state presents psychiatric evidence of the defendant's future dangerousness." <u>Id.</u> at 84-85. The Court reasoned that this was appropriate because:

> The state psychiatrist who treated Ake at the state mental hospital testified at the guilt phase that, because of his mental illness, Ake posed a threat of continuing criminal violence. This testimony raised the issue of Ake's future dangerousness, which is an aggravating factor under Oklahoma's capital

---

[4] Respondent argues that Whitehead is procedurally barred from making this claim because he only raised it in the context of a Sixth Amendment ineffective assistance of counsel claim in his state petition for post-conviction relief. Like the Fifth Amendment claim in section IV of this opinion, the court finds that Whitehead fairly presented the issue to the state courts; the court therefore reaches the merits of this claim.

sentencing scheme, and on which the prosecutor relied at sentencing.

Id. at 86. Shortly after deciding Ake, however, the Court clarified that to be constitutionally entitled to a court-appointed expert, a defendant must offer "more than undeveloped assertions that the requested assistance would be beneficial." Caldwell v. Mississippi, 472 U.S. 320, 323 n.1 (1985); see also, Weeks v. Jones, 26 F.3d 1030, 1041 (11th Cir. 1994) (defendant must exhibit "compelling evidence of insanity or incompetency" to be entitled to a court-appointed mitigation expert).

Courts interpreting Ake have done so narrowly and required defendants to show that the requested expert was necessary to rebut expert testimony from the state about the defendant's future dangerousness. See Ramdass, 187 F.3d at 409; Moore v. Reynolds, 153 F.3d 1086, 1108-09 (10th Cir. 1998), cert. denied, 119 S. Ct. 1266 (1999); Goodwin v. Johnson, 132 F.3d 162, 189 (5th Cir. 1997), cert. denied, 120 S. Ct. 208 (1999). Similarly, courts have required defendants to demonstrate a likelihood that their mental condition could have been a significant mitigating factor, Moore, 153 F.3d at 1108-09, and that a trial court's failure to appoint the requested expert was not

harmless error.  Ross v. Ward, 165 F.3d 793, 799 (10th Cir.), cert. denied, 120 S. Ct. 208 (1999).

In this case, Whitehead has failed to demonstrate a specific need for the expert he requested.  Rather than ask for a psychiatric expert to establish a mental defect as in Ake, Whitehead sought a "trained investigator or social worker."  Whitehead has not explained what purpose this investigator would have served.  Whitehead has also not shown that the information (currently unknown to the court) that could have been collected would have been a significant mitigating factor in the sentencing phase of his trial.  Finally, the court notes that the Illinois Supreme Court found this request meritless because the information sought would have been "cumulative."  Assuming that to be true, Whitehead could not (and has not) demonstrated that the trial court's refusal to appoint the expert would have changed the outcome of his sentencing process.

Whitehead next presents a modified version of the same argument when he contends that his trial counsel was ineffective for failing to motivate the court-appointed investigator he did have to properly do his

job. To meet his burden on this argument, Whitehead must show that, absent the investigator's and counsel's alleged errors, there is a reasonable probability that the outcome of his sentencing hearing would have been different. See Strickland v. Washington, 466 U.S. 668, 694 (1984). The Illinois Supreme Court rejected this suggestion, and so does this court. As Illinois' highest court found, the aggravating evidence in this case was overwhelming and very disturbing. To quote the Illinois Supreme Court:

> Evidence introduced at sentencing showed that defendant had a history of sexually abusing young girls, including at least one of his sisters. Defendant's sister testified in aggravation, and several young girls also testified describing the sexual abuse committed by defendant. Prior convictions included the arson and burglary of a fully occupied motel. When still a minor, defendant had also been adjudicated delinquent on charges of burglary.

> Trial counsel called three witnesses: defendant, his wife, and Dr. Ziporyn. Defendant testified that his family had been poor, his mother and father had physically abused him, and there was a history of mental illness in his mother's family. Defendant also admitted that he had sexually assaulted his sister, but said that it was not committed in the manner she had described. Defendant offered a defense of insanity in mitigation of his conduct. He testified that he had experienced a feverish feeling for about a week preceding the attack on the victim, and that he was unable to remember committing the crime.

Dr. Ziporyn testified that defendant suffered from an organic brain syndrome at the time of the crime which resulted in his experiencing impulse control problems. According to Dr. Ziporyn, defendant had central nervous system pathology and presented a clinical picture of brain damage. In Dr. Ziporyn's opinion, defendant could not conform his conduct to requirements of law. Defendant's wife testified that he behaved differently when he was drunk, and that he had previously complained of blackouts and fever.

Dr. Werner Tuteur, the State's rebuttal witness and a psychiatrist, testified that defendant suffered from no mental or emotional disturbance at the time of the murder. Dr. Tuteur diagnosed defendant as afflicted with pedophilia and alcohol abuse.

Defendant claims that the following additional evidence should have been introduced at his sentencing and would have militated against the death penalty. By affidavit, Dr. Linda Wetzel stated that it was likely that defendant was afflicted with Episodic Dyscontrol associated with a partial complex seizure disorder. Dr. Wetzel's affidavit described this brain syndrome as "an abrupt single act or short series of acts with a common intention carried through to completion with at least a partial release of tension or gratification of a special need." The syndrome also was described as having "the characteristic of a maladaptive, precipitous interruption in the life-style or the life-flow of the individual."

Dr. Michael Levins stated that defendant's dysfunctional background created a psychological condition of pedophilia which diminished his capacity for self-control and his ability to distinguish right from wrong; that the condition worsened with alcohol consumption, but was treatable; and that defendant experienced guilt, but would not be dangerous while

incarcerated. Dr. Levin also found that defendant possibly suffered from an organic brain impairment.

Cynthia Hines stated that she investigated defendant's family. Hines essentially reported that: defendant's mother was a severe and chronic alcoholic; several of defendant's siblings were alcoholics; he was an alcoholic and experienced blackouts; his parents were physically and emotionally abusive; and there was a pattern of incest in the family.

While Dr. Wetzel and Dr. Levin gave name and refined description to defendant's organic and psychologic disorders which Dr. Ziporyn had in part diagnosed, Hines merely provided more details about the known facts of defendant's family background, i.e., impoverished, abusive, alcoholic, incestuous. Essentially, this additional evidence was only cumulative and it must be balanced against aggravating evidence that was considerable.

Defendant's own lengthy testimony at sentencing bespoke a lack of contrition or remorse. We find that there does not exist a reasonable probability that had this additional evidence been introduced at sentencing defendant would have been spared the death penalty. Trial counsel was not ineffective for being unable or failing to investigate and present this evidence in mitigation at sentencing.

<u>People v. Whitehead</u>, 662 N.E.2d 1304, 1323-24 (Ill. 1996). Based on the facts of this case, the court cannot say that the Illinois Supreme Court's finding on this claim was unreasonable or contrary to clearly established federal law. The court therefore denies Whitehead's petition for a writ of habeas corpus on this issue.

## VII.

Citing <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), Whitehead asserts that the Illinois courts violated his Fourteenth Amendment due process rights when the trial court refused to order the prosecution to disclose evidence relating to Whitehead's sentencing hearing. The court rejects this argument as unpersuasive and inherently speculative. When asked for the information, the prosecution agreed to provide whatever evidence it had in its possession. Since the prosecution agreed to disclose all of its evidence related to the sentencing, there was no <u>Brady</u> violation. The Illinois Supreme Court's opinion makes this very clear and the court agrees with the Illinois court's following analysis of this issue:

> The defendant also argues that the trial judge erred in denying a discovery request made by defense counsel at the outset of the sentencing hearing. On that occasion counsel asked that the State be ordered to disclose any mitigating evidence in its knowledge or possession, and the defendant believes that the court's failure to make that order was improper. The defendant does not say what mitigating evidence, if any, the State might have had that was unknown to defense counsel.
>
> At the sentencing hearing, in response to defense counsel's request, the State's Attorney disputed the applicability of the discovery rules to a capital sentencing hearing but went on to say, "I have no problems. There is a

one-page report and then there is a two- or three-page statement from one of the witnesses--"; later, the State's Attorney said, "Your Honor, despite the fact that the Supreme Court has held to the contrary, we will tender to the defense counsel any documents which we have that pertain to anything in the hearing on aggravation." The defendant believes that the latter statement, with its reference to "anything in the hearing on aggravation," meant that only aggravating evidence would be revealed. That interpretation ignores the context in which the remark was made. Although the State's Attorney did not believe that the discovery rules were applicable in the sentencing proceeding, he agreed to provide defense counsel with the information they sought. In light of the apparent willingness of the State to divulge the material in its knowledge or possession, we construe the prosecutor's reference to "the hearing on aggravation" as a shorthand name for the hearing on aggravation and mitigation, the second part of the bifurcated sentencing hearing. We conclude that the State agreed to provide the defendant with whatever information it had, and accordingly the defendant could not have been prejudiced by the trial court's failure to compel disclosure.

People v. Whitehead, 508 N.E.2d 687, 700-01 (Ill. 1987).

In short, the Illinois Supreme Court's decision turns on a question of fact -- whether the prosecution had any evidence pertaining to the sentencing hearing that it withheld from Whitehead. The Illinois court found, as a factual matter, that the prosecution tendered all of the evidence it had related to the sentencing hearing. Whitehead fails to present this court with any proof that the prosecution withheld evidence;

rather, he merely speculates that there was other evidence. Mere speculation is not enough to show a <u>Brady</u> violation. Additionally, the Illinois Supreme Court's factual interpretation of the prosecutor's statements was not "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). Rather, it appears that the court's interpretation of the prosecutor's statement was a reasonable one. The court therefore denies relief on this claim.


## VIII.

After being found guilty, Whitehead had to decide whether he wanted his punishment to be decided by the trial court judge or by a jury. After consulting with his attorneys, Whitehead waived his right to a jury and chose to have his punishment decided by the court.

Whitehead now argues that his constitutional rights were violated because the trial court deprived him of the opportunity to make a knowing, voluntary, and intelligent waiver of his right to have a jury decide his fate. According to Whitehead, the trial judge committed a

constitutional error when he failed to inform Whitehead of the Illinois "one juror" rule which would have applied to his sentencing hearing had he opted for the jury. The Illinois "one juror" rule requires that, if the defendant opts to have a jury decide his punishment, then the entire jury must render a unanimous verdict in order to sentence the defendant to death. The obvious corollary of such a rule being that if the entire jury does not unanimously agree upon the death penalty, then the death sentence may not be imposed. Whitehead argues that since the trial judge did not give him the details of this "one juror" rule, his rights were violated.

Because the Seventh Circuit has issued two very extensive and well-reasoned opinions that soundly defeat this precise argument, the court will simply cite those decisions as its reason for rejecting this contention. See United States ex rel. Wandick v. Chrans, 869 F.2d 1084, 1087-88 (7th Cir. 1989); United States ex rel. Williams v. DeRobertis, 715 F.2d 1174, 1178-86 (7th Cir. 1983). These decisions make it abundantly clear that the Constitution does not require a state trial court to inform a

criminal defendant of the "substantial majority" requirement that accompanies the right to a jury trial.

In any event, the court also notes that, in making this argument, Whitehead bears the burden of showing that his waiver was not personally, intelligently, and voluntarily made.  See Adams v. United States ex rel. McCann, 317 U.S. 269, 281 (1942); Chrans, 869 F.2d at 1087.  In Adams, the Supreme Court explained why a habeas petitioner bears this burden by stating that:

> a determination of guilt by a court after waiver of jury trial could not be set aside and a new trial ordered except upon a plain showing that such waiver was not freely and intelligently made.  If the result of the adjudicatory process is not to be set at naught, it is not asking too much that the burden of showing essential unfairness be sustained by him who claims such injustice and seeks to have the result set aside, and that it be sustained not as a matter of speculation but as demonstrable reality.  Simply because a result that was insistently invited, namely, a verdict by a court without a jury, disappointed the hopes of the accused, ought not to be sufficient for rejecting it.

Adams, 317 U.S. at 281.  Whitehead has provided the court with absolutely no facts which even suggest that his waiver of the jury was an unintelligent or involuntary one.  For these reasons, the court denies relief on this claim.

## IX.

Whitehead next contends that he received ineffective assistance of counsel during his sentencing hearing. According to Whitehead, his trial attorneys (1) failed to investigate available mitigating evidence; (2) improperly advised Whitehead to waive a jury for his sentencing hearing based on the erroneous belief that the trial judge would not impose the death penalty because he was morally opposed to the death penalty; and (3) unreasonably advised Whitehead that it would be in his best interest to call as few witnesses as possible.

Before addressing the merits of these three contentions, respondent argues that Whitehead is procedurally barred from asserting his claim that he was improperly advised to waive a jury during the sentencing phase. The court agrees. Whitehead never argued to the state courts that he received ineffective assistance of counsel when his attorneys advised him to waive a jury because they thought that the trial judge's morality would preclude him from imposing the death penalty. See People v. Whitehead, 662 N.E.2d 1304, 1323 (Ill. 1996). Because he failed to fairly present this specific argument in state court, Whitehead cannot now raise the

issue in his federal habeas petition. See Everett v. Barnett, 162 F.3d 498, 502 (7th Cir. 1998) (finding procedural default because "the specific ground for ineffectiveness raised in the federal petition must have been raised in the state case"); accord Balfour v. Haws, 892 F.2d 556, 562-63 (7th Cir. 1989).[5]

Turning to the merits of Whitehead's claims, he first contends that he received ineffective assistance of counsel because his attorneys failed to investigate and discover mitigating evidence and present that evidence at his sentencing hearing. The Illinois Supreme Court rejected this theory because it found that the mitigating evidence Whitehead argues should have been introduced would not have altered the probable outcome of the sentencing hearing. See People v. Whitehead, 662 N.E.2d 1304, 1324 (Ill. 1996). After reviewing the Illinois Supreme Court's analysis of this issue, the court cannot say that it was unreasonable or contrary to clearly established federal law. Rather, the record shows that the mitigation evidence Whitehead argues should have been introduced is substantially

---

[5] Whitehead could, of course, overcome this procedural bar if he showed "cause and prejudice" for the default, or if he demonstrated that the court's failure to consider the issue would result in a "fundamental miscarriage of justice." However, Whitehead has not even attempted to make either showing. The court therefore considers these arguments forfeited.

similar to the evidence that he did present at his sentencing hearing. Because the proposed evidence was very similar, it is not likely that the additional evidence would have changed the outcome of the sentencing hearing.

In his other ineffective assistance of counsel claim, Whitehead argues that his attorneys erred by advising him to call as few witnesses as possible during his sentencing hearing. The court finds this argument unpersuasive. As explained by the Illinois Supreme Court, the mitigating evidence that Whitehead's attorneys did present was very similar to the other evidence he now says should have been introduced. Thus, even if his attorneys had presented additional witnesses, those witnesses would not have added much to the sentencing hearing. Moreover, Whitehead's attorneys may have had sound strategic reasons for not wanting a prolonged sentencing hearing. Accordingly, the court concludes that the Illinois Supreme Court's decision on this issue was not unreasonable or contrary to clearly established federal law.

## X.

Whitehead next claims constitutional error by the Illinois courts because the sentencing judge's decision to impose the death penalty rested in part on unreliable evidence of other crimes. Whitehead refers specifically to several statements that he made in 1975 in which he previously admitted to committing several other sex crimes against young girls, including his sister. According to Whitehead, he fabricated many of those stories to establish an insanity defense in a prior criminal prosecution. Additionally, Whitehead cites statements he made during two court-ordered interviews with a psychiatrist who testified against Whitehead at his sentencing hearing. Whitehead claims that these statements should not have been considered because he was not given his <u>Miranda</u> warnings before making the statements.

"The Eighth Amendment does not establish a federal code of evidence to supersede state evidentiary rules in capital sentencing proceedings." <u>Romano v. Oklahoma</u>, 512 U.S. 1, 12 (1994). However, the Due Process Clause of the Fourteenth Amendment does apply to state capital sentencing proceedings. <u>See id.</u> Thus, for constitutional

purposes, "the relevant question . . . is whether the admission of evidence . . . so infected the sentencing proceeding with unfairness as to render the imposition of the death penalty a denial of due process." Id.

Contrary to Whitehead's suggestion, the statements he made in 1975 carry very significant indicia of reliability – *he made them and he admitted during the sentencing hearing that he made them*. It is a generally accepted understanding that defendants do not make statements against their penal interest unless they are true. This very theory forms the basis for excluding party statements against interest from the definition of hearsay. See Fed. R. Evid. 801(d)(2). Thus, since Whitehead made these statements, and he admitted making them, the statements are inherently reliable. As reliable statements, they were properly admitted and properly considered by the sentencing judge.

As for Whitehead's claim that the statements he made to the state's psychiatrist should not have been admitted because he did not receive a Miranda warning before making them, this argument also fails. First, as respondent correctly points out, Whitehead is procedurally barred from raising this issue. He did not object to the introduction of the statements

at the sentencing hearing and the Illinois Supreme Court considered the issue waived. See People v. Whitehead, 508 N.E.2d 687, 700 (Ill. 1987). Because the Illinois Supreme Court treated the argument as waived, this constitutes an adequate and independent state ground for a decision and forecloses federal habeas review. In any event, even if the court could reach the merits of this claim, it would fail. Given the other extensive aggravating evidence, the addition of these two statements could not have rendered the sentencing hearing so fundamentally unfair as to deprive Whitehead of due process. The court therefore concludes that the Illinois Supreme Court's decision on this issue was not unreasonable or contrary to established federal law.

## XI.

Whitehead's final argument attacks the constitutionality of the Illinois death penalty statute. The Illinois Supreme Court addressed this contention at length in Whitehead's direct appeal and rejected it. See id. at 701-02. Having carefully reviewed the Illinois court's analysis and conclusion, this court cannot say that the Illinois Supreme Court's

decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

## Conclusion

For the foregoing reasons, the court denies Whitehead's petition for a writ of habeas corpus under 28 U.S.C. § 2254.

E N T E R:

**Ann Claire Williams,
Judge**

Dated: **March 30, 2000**